

SEALED

UNITED STATES OF AMERICA,

    Plaintiff,

v.

RAMOR DIS TICARET, LTD.,
a/k/a The Ramor Group,
RESIT TAVAN, and
FULYA KALAFATOGLU OGUZTURK,

    Defendants.

Case No. 17-CR-122

[Title 18, United States Code, Sections 2,
371, 554(a), and 1956(a)(2)(A);
Title 50, United States Code, Section
1705(a); and Title 31, Code of Federal
Regulations, Parts 560.203. 560.204 and
560.205]

## INDICTMENT

### Relevant Individuals and Entities

At all times relevant to this Indictment:

    1.    RAMOR DIS TICARET, LTD., a/k/a The Ramor Group ("RAMOR"), was registered as a corporation in Turkey with an office located in Istanbul. RAMOR's business included procuring commercial marine equipment, goods, and materials from the United States for shipment to customers in Iran. One of RAMOR's customers was Qeshm Madkandalou Shipbuilding Cooperative of Iran.

    2.    RESIT TAVAN ("TAVAN") was a citizen of Turkey residing in Istanbul. TAVAN was the sole owner and President of RAMOR.

    3.    FULYA KALAFATOGLU OGUZTURK ("OGUZTURK") was a citizen of Turkey residing in Istanbul. OGUZTURK was employed by RAMOR as a Deputy Manager.

    4.    Qeshm Madkandalou Shipbuilding Cooperative of Iran ("Madkandalou") was an

Iranian entity affiliated with the Government of the Islamic Republic of Iran. Madkandalou was located on Qeshm Island, Iran.

5. Rohollah Vosoughi ("Vosoughi") was an Iranian citizen who resided at times in both Iran and Turkey. Vosoughi worked for both Madkandalou and RAMOR, serving at times as a commercial manager for Madkandalou.

6. Reza Almasi ("Almasi") was an Iranian citizen residing in Tehran and employed at Madkandalou as a production manager, naval architect, and shipbuilder. Almasi was involved, among other things, in the development and building of Iranian naval vessels, including a prototype 16-meter missile attack vessel known as the RMS-16.

7. Company A, located in the State and Eastern District of Wisconsin, was a commercial outboard engine manufacturer that produced high-powered marine engines for both domestic and foreign customers.

8. Company B, located in the State and Eastern District of Wisconsin, was a commercial manufacturer that produced, among other products, marine generators used to power the electronic components of marine vessels.

9. Company C, located in the State and Eastern District of Wisconsin, was a commercial manufacturer that produced, among other marine products, propulsion systems.

## The Iran Trade Embargo and the Iranian Transactions Regulations

10. The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1702(a)(1), gave the President of the United States broad authority to regulate exports and other international transactions in times of national emergency. IEEPA controls were triggered by an executive order declaring a national emergency based on an "unusual and extraordinary threat, which had its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." Executive orders issued

pursuant to IEEPA could impose broad trade restrictions against a particular country that were more comprehensive than standard export controls. An embargo barred United States persons from engaging in a broad range of transactions involving an offending foreign government or its nationals, unless specific United States government authorization was obtained in advance.

11. Pursuant to IEEPA authority, on March 15, 1995, the President issued Executive Order 12957, which declared a national emergency with respect to Iran and the government of Iran. The executive order was issued based on presidential findings that the policies and actions of the government of Iran constituted a threat to the national security of the United States due to Iran's support of international terrorism and its attempts to acquire weapons of mass destruction.

12. Pursuant to IEEPA authority, on May 6, 1995, the President issued Executive Order 12959, which declared a trade embargo against Iran, prohibiting (with limited exceptions not applicable here) the export from the United States to Iran of any goods, technology, or services. On August 17, 1997, the President reiterated and renewed the embargo by issuing Executive Order 13059. The most recent continuation of this declaration of national emergency and embargo was issued on August 4, 2016. The embargo remained in effect during all times relevant to this Indictment.

13. The United States Department of Treasury, Office of Foreign Assets Control ("OFAC") issued regulations implementing the executive order and trade embargo (the "Iranian Transactions Regulations" or "ITR"). In October 2012, the Department of Treasury reissued and renamed the ITR as the Iranian Transactions and Sanctions Regulations ("ITSR"). The substantive provisions of the ITR were not changed by this action and remained in effect. These regulations prohibited both (i) the export of goods or services from the United States to Iran and (ii) the reexportation of U.S. origin goods and services from a third country, directly or indirectly, to Iran, without a license issued by OFAC.

3

14. The Executive Orders as identified above and the ITR or ITSR were in effect at all times relevant to this Indictment.

15. At no time relevant to this Indictment did RAMOR, TAVAN, and OGUZTURK, or any other entity controlled by RAMOR, TAVAN, and OGUZTURK, obtain a license from OFAC authorizing any of them to export any goods from the United States to Iran.

Reports to the United States Government and the Automated Export System

16. Under United States law and regulation, exporters, shippers, and freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings were completed through the submission of Electronic Export Information ("EEI") via the Automated Export System ("AES"). The U.S. Department of Homeland Security ("DHS"), Bureau of Customs and Border Protection, administered the AES. The EEI and accompanying materials were official documents submitted to the DHS in connection with export shipments from the United States.

17. An essential and material part of the EEI was information concerning the ultimate consignee and the country of ultimate destination for the export. The identity of the ultimate consignee determined whether the goods (a) could be exported without any specific authorization from the United States government; (b) could be exported with the specific authorization and validated license from OFAC; or (c) could not be exported from the United States.

18. The EEI was equivalent to a sworn statement to the United States government that the transaction occurred as described. The EEI was used by the United States Bureau of Census to collect trade statistics and by the Department of Commerce, Bureau of Industry and Security ("BIS"), for export control purposes.

4

## COUNT 1

**THE GRAND JURY FURTHER CHARGES THAT:**

19. Beginning in or around March 2013, the exact date being unknown to the Grand Jury, and continuing through in or about July 2015, in the State and Eastern District of Wisconsin and elsewhere,

**RAMOR DIS TICARET, LTD.,**
**a/k/a The Ramor Group,**
**RESIT TAVAN, and**
**FULYA KALAFATOGLU OGUZTURK**

knowingly and intentionally combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury,

(a) to defraud the United States by impairing, impeding, and obstructing the lawful governmental functions of the United States Department of Treasury, that is, the enforcement of laws and regulations prohibiting the export of goods from the United States to Iran without a license; and

(b) to commit an offense against the United States, to wit: smuggling, by knowingly and fraudulently exporting and sending, and attempting to export and send, from the United States to Iran, articles and objects contrary to IEEPA, Title 50, United States Code, Section 1705, and the ITSR, Title 31, Code of Federal Regulations 560.203-205, in violation of Title 18, United States Code, Section 554(a);

### MANNER AND MEANS OF THE CONSPIRACY

20. The conspirators used the following manner and means, among others, to accomplish the objects of the conspiracy:

a. TAVAN, OGUZTURK, and RAMOR, directly and indirectly ordered, negotiated, and procured equipment, goods, and technologies from United States companies for the end use of one or more persons and entities associated with, or part of, the Iranian military.

b. TAVAN, OGUZTURK, and RAMOR, directly and indirectly purchased equipment, goods, and technologies from the United States as directed by persons and entities located in Iran, including Almasi and Madkandalou, knowing that such equipment, goods, and technologies would be exported and reexported through Turkey to Iran.

c. TAVAN, OGUZTURK, and RAMOR, together with other unindicted coconspirators, exported and reexported, and caused the export and reexport, of U.S. origin goods, technology, and services to Iran for the use of persons and entities associated with or part of the Iranian military and, in order to do so, evaded and otherwise failed to obtain the required export licenses from the United States government.

## ACTS IN FURTHERANCE

21. In furtherance of the conspiracy and to effect the objects of the conspiracy, the conspirators committed or caused to be committed one or more of the following acts in the State and Eastern District of Wisconsin and elsewhere.

### The Exportation of Two Model 557 Engines from Company A

22. In April and May, 2013, TAVAN communicated by email with Vosoughi concerning the acquisition of U.S. origin Model 557 high-powered outboard engines manufactured by Company A (the "557 Engines") in the Eastern District of Wisconsin. On May 8, 2013, TAVAN sent a pro forma invoice to Vosoughi and OGUZTURK regarding the purchase of two 557 Engines.

23. On May 15, 2013, Vosoughi sent by email to Almasi and other persons at Madkandalou a copy of a pro forma invoice regarding the purchase of the 557 Engines showing a total purchase price of $204,604.

24. On May 21, 2013, TAVAN, on behalf of RAMOR, signed a purchase agreement for the 557 Engines with a U.S. commercial brokerage business acting as an agent for RAMOR in dealing with Company A. TAVAN represented that the 557 Engines would only be used in Turkey and that, pursuant to U.S. law, RAMOR would not transfer the 557 Engines to any "sanctioned nation."

25. On July 1, 2013, TAVAN signed a BIS Form 711, "Statement by Ultimate Consignee and Purchaser," which identified RAMOR, Istanbul, Turkey, as the ultimate consignee, and certified that the 557 Engines would be used in Turkey and would not be reexported.

26. On September 13, 2013, Vosoughi sent by email to Almasi and others at Madkandalou, two documents, a packing list and an invoice, both bearing RAMOR letterhead and addressed to "Qeshm Madkandalou Shipbuilding Cooperative Co., Shibderaz Village - Kandalou Region - Qeshm Island - Iran." Item 5 on both documents references a set of two outboard motors, and item 5 on the packing list identifies two 557 horsepower outboard engines manufactured by Company A.

27. On December 29, 2013, Almasi emailed Vosoughi and TAVAN concerning the return of the 557 Engines from Iran to Turkey.

28. On January 27, 2014, Vosoughi emailed TAVAN and OGUZTURK an invoice on Madkandalou letterhead for return shipment of the 557 Engines from Qeshm Island, Iran, to RAMOR in Istanbul, Turkey.

29. In four payments between March 2013 and June 2013, RAMOR transmitted a total of $190,000 from Turkey to Company A's broker in the United States.

7

## The Exportation of a Marine Generator from Company B

30. On December 1, 2013, acting on behalf of RAMOR, TAVAN signed a contract with Madkandalou by which RAMOR agreed to act as a general contractor for Madkandalou on a project to design and build a "High Speed Composite Boat," known as the RMS-16, for delivery and use in Iran. RAMOR agreed to procure necessary component parts required to construct the RMS-16, including procuring one of three types of marine power generators, one of which was manufactured in the U.S. by Company B in the Eastern District of Wisconsin.

31. On July 14, 2014, Almasi sent an email to Vosoughi and a naval architect directing that the RMS-16 be designed and constructed to allow clearance for a "Nasr type" missile. In response, on July 14, 2014, the naval architect sent an email to Almasi, Vosoughi, and TAVAN confirming that the RMS-16 design provided sufficient clearance for the missile system. Attached to the email is a digital drawing of the RMS-16 showing integrated covert missile launching tubes.

32. On December 30, 2014, Vosoughi sent Almasi an email that included as an attachment a pro forma invoice to RAMOR from a Turkish distributor of Company B. The pro forma invoice, in the amount of $13,250, was for a "17.5EFOZD" marine diesel generator manufactured by Company B. The invoice included a handwritten notation of "RMS-16."

33. On January 5, 2015, and June 30, 2015, RAMOR paid $6,628 and $6,622, respectively, to Company B's Turkish distributor. Appearing on a document related to the June 2015 payment are handwritten notations reading "RMS-16," "generator," and the name of Company B's Turkish distributor.

34. On June 1, 2015, via money wire transfer, the Turkish distributor paid $9,686.40 to Company B for the marine generator.

35. On July 6, 2015, Vosoughi emailed Almasi a packing list and invoice on RAMOR letterhead, dated July 3, 2015, and addressed to Madkandalou which included a line item referring to Company B's 17.5 Marine Generator; Qty: 1; Origin: USA.

### The Exportation of Marine Surface Drives from Company C

36. Pursuant to the RMS-16 contract, RAMOR sought to purchase marine power propulsion equipment, known as Arneson ASD-14 Surface Drives, from Company C for delivery to Madkandalou for use on the RMS-16. On January 30, 2015, a Turkish distributor for Company C provided a preliminary price quotation to RAMOR for two Arneson ASD-14 Surface Drives, manufactured by Company C in the Eastern District of Wisconsin. Vosoughi emailed the quotation to Almasi on February 10, 2015.

37. On February 18, 2015, a Turkish distributor for Company C provided a pro forma invoice to RAMOR for two Arneson ASD-14 Surface Drives, manufactured by Company C. Vosoughi emailed the pro forma invoice to Almasi on February 20, 2015, stating a total cost of $157,000.

38. In June 2015, RAMOR paid $142,000 to Company C's Turkish distributor for the purchase and export of two Arneson ASD-14 Surface Drives.

39. On July 6, 2015, Vosoughi emailed Almasi a packing list and invoice on RAMOR letterhead, dated July 3, 2015, and addressed to Madkandalou which included a line item referring to Company C's Arneson Propulsion System; Qty: 2; Origin: USA.

40. On July 27, 2015, the Turkish distributor paid approximately $113,000 to Company C via money wire transfer for the Arneson ASD-14 Surface Drives.

All in violation of Title 18, United States Code, Section 371.

## COUNTS 2-4

**THE GRAND JURY FURTHER CHARGES THAT:**

41. On or about the dates listed below, in the State and Eastern District of Wisconsin and elsewhere,

**RAMOR DIS TICARET, LTD.,**
a/k/a The Ramor Group,
**RESIT TAVAN, and**
**FULYA KALAFATOGLU OGUZTURK**

knowingly and willfully violated the embargo against Iran by attempting to export and causing to be exported the goods described below from the United States to Iran without having first obtained the required authorizations from the United States Department of Treasury, Office of Foreign Assets Control:

| Count | Dates | Goods |
|---|---|---|
| 2 | August 10, 2013 | Model 557 Outboard Engines |
| 3 | April 10, 2015 | 17.5EFOZD Marine Generator |
| 4 | June 3, 2015 | Arneson ASD-14 Surface Drives |

All in violation of Title 50, United States Code, Section 1705(a), Title 31, Code of Federal Regulations, Parts 560.203 and 560.204, and Title 18, United States Code, Section 2.

10

## COUNTS 5-7

**THE GRAND JURY FURTHER CHARGES THAT:**

42. On or about the dates listed below, in the State and Eastern District of Wisconsin and elsewhere,

**RAMOR DIS TICARET, LTD.,**
a/k/a The Ramor Group,
**RESIT TAVAN, and**
**FULYA KALAFATOGLU OGUZTURK**

knowingly and fraudulently exported and sent, and attempted to export and send, from the United States merchandise, articles, and objects described below, contrary to the laws and regulations of the United States, specifically Title 50, United States Code, Section 1705(a) and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204:

| Count | Dates | Goods |
|---|---|---|
| 5 | August 10, 2013 | Model 557 Outboard Engines |
| 6 | April 10, 2015 | 17.5EFOZD Marine Generator |
| 7 | June 3, 2015 | Arneson ASD-14 Surface Drives |

All in violation of Title 18, United States Code, Sections 554(a) and 2.

11

## COUNTS 8-13

THE GRAND JURY FURTHER CHARGES THAT:

43.     On or about the dates listed below, in the State and Eastern District of Wisconsin and elsewhere,

**RESIT TAVAN and
FULYA KALAFATOGLU OGUZTURK**

transmitted and transferred, and attempted to transmit and transfer, the monetary instruments and funds listed below, from a place outside the United States, that is Turkey, to a place inside the United States, with the intent to promote the carrying on of specified unlawful activity, that is willfully exporting goods from the United States to Iran without a license in violation of Title 50, United States Code, Section 1705(a), and Title 31, Code of Federal Regulations, Parts 560.203 and 560.204, and smuggling goods from the United States in violation of Title 18, United States Code, Section 554:

| Count | Date | Amount |
|---|---|---|
| 8 | March 8, 2013 | $50,000.00 |
| 9 | April 11, 2013 | $50,000.00 |
| 10 | May 30, 2013 | $40,000.00 |
| 11 | June 28, 2013 | $50,000.00 |
| 12 | June 1, 2015 | $9,686.40 |
| 13 | July 27, 2015 | $113,027.21 |

All in violation of Title 18, United States Code, Sections 1956(a)(2)(A) and 2.

## FORFEITURE NOTICE

44. Upon conviction of any one or more of the followings offenses, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such offense or offenses of conviction: (a) conspiracy to smuggle, in violation of Title 18, United States Code, Section 371, as charged in Count 1 of this Indictment; (b) exportation to Iran without a license, in violation of Title 50, United States Code, 1705(a), as charged in Counts 2 through 4 of this Indictment; or smuggling, in violation of Title 18, United States Code, Section 554(a), as charged in Counts 5 through 7 of this Indictment. The property to be forfeited includes, but is not limited to, a sum of money equal to the proceeds derived from the offense or offenses of conviction.

45. Upon conviction of one or more offense in violation of Title 18, United States Code, Section 1956, set forth in Counts 8-13 of this Indictment, the defendant shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 982(a)(1), any property, real or personal, involved in such offense, and any property traceable to such property, including, but not limited to, a sum of money equal to the value of the property involved in the offense or offenses of conviction.

46. If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, pursuant to Title 21, United States Code, Section 853(p), as incorporated by

13

Case 2:17-cr-00122-PP   Filed 06/27/17   Page 13 of 14   Document 1

Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b)(1).

A TRUE BILL:

███████████████

FOREPERSON
Dated 06/25/17

_____
GREGORY J. HAANSTAD
Fw  United States Attorney