UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

              Plaintiff,

v.                                        Case No. 17-CR-122

RAMOR DIS TICARET, LTD.,
a/k/a The Ramor Group,
RESIT TAVAN, and
FULYA KALAFATOGLU OGUZTURK,

              Defendants.

## UNITED STATES RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR PRETRIAL RELEASE

The United States of America, by and through its attorneys, Gregory J. Haanstad, United States Attorney, and Paul L. Kanter and Keith S. Alexander, Assistant United States Attorneys, and William Mackie, Trial Attorney, National Security Division, U.S. Department of Justice, hereby submits this Response in Opposition to Defendant's Motion for Pretrial Release (the "Response in Opposition"). The United States requests that the Court reaffirm its initial order detaining the defendant prior to trial for the reasons and authorities cited herein.

### SUMMARY OF ARGUMENT

Resit Tavan is charged with serious crimes affecting the national security of the United States. The evidence is overwhelming that he knowingly, through his company in Turkey, exported equipment to Iran that was intended for an Iranian military attack boat. He deceived the American manufacturers of that equipment, and later commerce officials, into believing that the equipment never left Turkey. The evidence shows he knew full well that he intended to reexport that equipment to Iran.

Moreover, Mr. Tavan has no ties to this community. He has no ties to the United States. All of his financial and personal ties are in Turkey. Turkish law forbids extradition to face crimes in another country, including the United States. So, if he were to return to Turkey, the United States would almost certainly be unable to arrest him and bring him back before the Court.

Mr. Tavan took extraordinary efforts to avoid American jurisdiction after his arrest in Romania. He claimed to be facing charges for an environmental crime in Turkey (that was only filed after his arrest in Romania). He even sought *asylum* in Romania, away from his family, to avoid facing the charges in this case. His actions bespeak a man wishing to avoid the substantial penalties for the crimes that there is overwhelming evidence he committed.

Mr. Tavan has every incentive to avoid the jurisdiction of this Court and flee to Turkey. His family, his business, and even the possibility of continuing his business relationship with Iranian entities await him there. An electronic monitoring bracelet that he can cut off, an unspecified rental agreement, and an unsecured $10,000 bond come nowhere near to changing his incentive to flee. If he reaches Turkey, or any of its embassies, he will likely forever avoid trial in this matter. His risk of flight is substantial, and so the Court should reaffirm its order to detain him.

## FACTUAL AND PROCEDURAL BACKGROUND

On June 8, 2017, Romanian law enforcement authorities arrested the defendant pursuant to an arrest warrant for a criminal complaint that the Court issued on May 30, 2017. Case No.17-M-1306. The complaint alleged that the defendant committed the following violations of criminal law: (i) conspiracy to violate the International Emergency Economic Powers Act

("IEEPA," 50 U.S.C. §1705) and the Iranian Transactions and Sections Regulations (the "ITSR," 31 C.F.R. §560.203-205); (ii) conspiracy to defraud the United States by impeding and obstructing lawful government functions (18 U.S.C. §371); (iii) smuggling (18 U.S.C. §554(a)); (iv) wire fraud (18 U.S.C. §1343); and (v) international money laundering (18 U.S.C. §1956(a)(2)). As outlined in the supporting affidavit for the complaint, these charges relate to the defendant's participation in a conspiracy to use his Turkish based business, Ramor Dis Ticaret, Ltd. ("Ramor"), to illegally procure and cause the export of U.S. origin products for "export, re-export, sale and supply to Iran or the Government of Iran." See Complaint Affidavit, p. 3.

On June 30, 2017, the grand jury returned an indictment charging the defendant with the same crimes. See Doc. 1. Specifically, the indictment alleges that the defendant, through Ramor, participated in a conspiracy to procure, export and reexport, and cause to be exported and reexported, U.S. origin goods, namely marine equipment, to Iran for the use at an Iranian government-affiliated shipyard, known as Qeshm Madkandalou Shipbuilding Cooperative of Iran ("Madkandalou"). The indictment further alleges that the defendant was responsible for procuring various component parts to be used in the construction of an Iranian military prototype missile attack boat known as the RMS-16, including a U.S. origin marine power generator and a propulsion system known as a "surface drive." The indictment charges that the defendant also conspired to illegally procure and cause the export of two high-powered marine outboard engines for use and testing by the Iranian military.

On July 21, 2017, the United States submitted a formal request to the Romanian government for extradition of the defendant to the United States to stand trial on the indictment.

3

The defendant did not waive extradition or voluntarily agree to submit to the jurisdiction of the United States. Rather, the defendant contested the United States' extradition request based upon both procedural and substantive grounds. Under the existing rules of the Romanian courts, the extradition process is normally processed within sixty days after the defendant's arrest. In this case, the defendant's challenge to the extradition proceeding required multiple hearings and requests for additional documents from the United States. It lasted from June until early October, at which time the Romanian court concluded the proceedings.

Towards the end of the extradition process, however, in October 2017, the defendant attempted two notable, and unusual, actions in an effort to thwart the exercise of U.S. jurisdiction.

First, the defendant filed a claim that he had been charged in Turkey with some version of an environmental crime and moved for the Romanian court to extradite him back to Turkey.[1] See Exhibit 1. The Romanian court, however, found that the alleged Turkish crime the defendant represented had been brought against him, and which formed the basis for his request for extradition to Turkey, was filed after the United States' extradition request, involved a less serious offense, and did not merit superseding the United States' request. The court, accordingly, denied the motion.

Secondly, in a last ditch effort to thwart the United States' extradition request, the defendant filed a claim for asylum in Romania. He asked the Romanian court to suspend or dismiss the extradition decision based upon his claim for Romanian asylum. Exhibit 2. Apparently, the defendant decided it was more important to remain in Romania to avoid the

---

1 It should be noted that under Turkish law, the Turkish government cannot (and will not) extradite Turkish nationals to another country, including the United States.

4

jurisdiction of the United States, even though his wife and children lived in Turkey. The Romanian court ultimately denied this gambit.

On October 27, 2017, the Romanian Court of Appeals entered a final order granting the United States' request to extradite the defendant to the United States. Exhibits 3 and 4.

On December 11, 2017, the defendant appeared before this Court for his arraignment and bond hearing. Doc. 6. The Court ordered that the defendant be detained pending trial because the defendant was a risk of flight. Doc. 8.

On February 2, 2018, the defendant filed a Motion for Pretrial Release on Bond (the "Motion for Release") arguing for pre-trial release on the grounds that he does not represent either a danger to the community or a risk of flight. The defendant requested "release on personal recognizance or in the alternative unsecured appearance bond in the amount not exceeding $10,000." Doc. 12, p.9.

In the Motion for Release, the defendant offers three conditions which apparently he deems sufficient to reasonably assure the Court of his appearance at trial. First, the defendant states that he will (or has) rented an apartment in Milwaukee, though it is not apparent how this would be funded. Secondly, he would agree to be subject to electronic monitoring as a condition of his release. Lastly, the defendant's legal counsel represents that she "is willing to act as a third-party custodian." Id., at 2. The Motion for Release does not address how, as a third-party custodian residing in Illinois and over 80 miles away, counsel could effectively serve in any meaningful supervisory capacity to mitigate the defendant's risk of flight which the Court, in its initial holding, found to exist.

5

Prior to addressing the defendant's arguments, the government summarizes its objections to the defendant's Motion for Release as follows:

First, unlike the vast majority of cases that come before this Court, this defendant is a Turkish national with absolutely no ties whatsoever to the United States (let alone the Milwaukee community), whether of a personal, familial, business, property, political, ideological or even emotional nature. Nor does he have any incentive to remain in this jurisdiction while facing a significant risk of a lengthy sentence of incarceration. All of his assets and financial resources, which may be extensive, are in Turkey (or in other countries). All of his personal, family and emotional ties are also in Turkey. The proposition that a short term rental of an apartment, of which the defendant would have no property or other vested interest, would serve as a basis to find a sufficient or a strong tie to the community is, at best, simply unrealistic. To combine the idea of a short term rental apartment with the suggested *unsecured* bond of $10,000 as means to "reasonably assure his appearance" is equally meaningless.

Secondly, the nature of the offenses and the heavy weight of the evidence against the defendant strongly suggests that should the defendant be released and flee the jurisdiction of the Court by escaping back to Turkey (which does not extradite nationals), he will represent a danger to the national security of the United States. As further described below, the defendant is charged with conduct related to the proliferation of strategic dual use marine engineering products in support of the Iranian military. This is not just a matter of whether the defendant is *personally* violent or dangerous. The Court must consider the possibility that should the defendant flee and resume his past conduct and business, he represents a danger to our community by resuming that part of his business of supplying materials to support the military of

6

Iran, which is openly hostile to the United States. *See United States v. Manso-Portes*, 786 F.2d 889, 890 (7th Cir. 1988) (the Bail Reform Act does not limit "danger to the community" to threats of violence, but also includes dangerous conduct, such as the sale of drugs); *United States v. Trammel*, 922 F.Supp. 527, 532 (N.D. Okla. 1995) (detention is appropriate where "[t]he defendant might engage in criminal activity to the detriment of the community"); *United States v. Williams*, 565 F.Supp. 350, 352 (N.D. Ill. 1983) ("The fact that the community may suffer only a pecuniary harm if the defendant is released justifies denial of bond.") and 18 U.S.C. § 3142(g)(4).

## MEMORANDUM OF LAW

Under the Bail Reform Act, the defendant may be (1) released on personal recognizance, (2) released on conditions, (3) temporarily detained, or (4) detained. 18 U.S.C. § 3142(a) & (e). The defendant seeks "release on personal recognizance or in the alternative unsecured appearance bond in the amount not to exceed $10,000." Motion for Release, p.9. This reflects the first two options noted above. The government continues to seek pre-trial detention because Mr. Tavan presents a clear flight risk. There exist no combination of conditions that can reasonably assure his continued presence in the United States.

In cases where the government's basis for detention is dangerousness, the government bears the burden of proof by "clear and convincing evidence." Yet, in cases where the question is whether the defendant poses a flight risk, the burden of proof is that of a "preponderance of evidence." *United States v. Portes*, 768 F.2d 758, 764-5 (7th Cir. 1985); *United States v. Hazime*, 762 F.2d 34, 37 (6th Cir. 1985); *United States v. Wade*, 2007 WL 2005556, *2 (E.D. Wis. 2007).

7

To determine whether there are conditions of release that will reasonably assure the appearance of the defendant, the Court must consider (1) the nature and circumstances of the offenses charged in the indictment; (2) the weight of the evidence; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g); *United States v. Hammond*, 204 F.Supp.2d 1157, 1161 (E.D. Wis. 2002).

To begin with, the nature and circumstances of the underlying offense – the illegal export of strategic dual-use equipment for military use by a hostile power – supports the conclusion that the defendant is a flight risk. The defendant's business with Iranian government associated entities depends entirely upon his continued presence and operation in Turkey. If he is not there, the Iranians will have to find other people to replace him in the procurement network role in which he has been serving for years. Yet, if he returns quickly, it will be quite possible for him to reestablish his business relationship with the Iranian government associated customers by creating another front company to conduct business with United States suppliers, all the while concealing his role by employing others to serve as nominal officers.

Of equal importance, the defendant is facing a significant term of incarceration, and should that possibility become a reality, both he and his family would face severe economic consequences as his business collapses. As emphasized in the Motion for Release, his family will continue to endure emotional hardship. He has every incentive to flee.

The second factor relates to the weight of the evidence against the defendant. In essence, the defendant stands charged with a conspiracy to illegally procure and export by fraud U.S. origin maritime equipment on the false representation that his company, Ramor, was obtaining

8

these materials for end users in Turkey, when the true end user was the Iranian Madkandalou shipyard for the purpose equipping the Iranian military. By way of example, attached as Exhibit 5 are representative samplings of the documentary evidence (provided under discovery to the defendant) that demonstrate that the defendant was fully engaged in an ongoing business dealing with a major customer, the Iranian Madkandalou shipyard, to assist in procuring a marine power generator and propulsion surface drives for the Iranian RMS-16 missile attack boat, and high powered out board engines for use by the Iranian military. The evidence includes multiple and extensive emails between the defendant and his Iranian customers (including a Madkandalou officer who was attached to work at Ramor with the defendant), and a range of contracts, design sheets and diagrams, invoices, and financial records.

The defendant is woefully mistaken in asserting that these "charges are not as serious as they sound. [The defendant] simply got caught up in a misunderstanding and the charges relate to imports from his business." Motion for Release, p.4. Actually, the charges relate to, simply, his *reexport* of these good for the use by the Iranian military. Moreover, he misstates that "[t]he goods relevant to the charges are just two engines purchased in Wisconsin…and [that] he simply made a mistake." Id. Besides downplaying the nature of the high powered engine purchases, nowhere does he make even a passing reference to the marine generator and propulsion surface drives. In asserting the government's "case is weak," the defendant misrepresents that the evidence against the defendant is "based upon multi language translated materials and/or hearsay." Id., at 5. As the bulk of the evidence shows, all of the contracts, design records, invoices, spreadsheets, financial records and emails are in English. And as for "hearsay," the government will seek to introduce statements of co-conspirators pursuant to Rule 801(d)(2)(E) of

9

the Federal Rules of Evidence. More to the point, as the government's evidence is significant and substantial, if not overwhelming (hardly "weak"), this only serves to increase the risk that the defendant will flee.

The history and characteristics of the defendant also indicate that he is a serious risk of flight. As noted at the outset, unlike most of the defendants coming before the Court, this defendant has absolutely no connections or ties to the United States. None. He has spent his entire life in Turkey. Motion to Release, p.6. He has no relatives or even known personal friends in the U.S., nor any property, financial investments or bank funds. Despite the documentary evidence to the contrary, the defendant claims he "does not speak English," Motion for Release, p.2, nor likely does his family. The entirety of his existence is associated with Turkey. All of his business and financial resources, political and social connections, all of his relatives, and his wife and young children are in Turkey.

The defendant reports that his family is struggling with his "prolonged absence" and with "severe depression and anxiety" from his absence and "lack of support" in caring for the young children, not to mention the children's emotional and behavioral problems. Yet, that all powerfully points to an overwhelming incentive to *flee back to Turkey*.

On top of all this, not only does Turkey not have an extradition treaty with the United States, Turkish law forbids the extradition of Turkish nationals to other countries to stand trial for criminal violations. The defendant even went to the extraordinary length of applying for asylum in Romania rather than be brought to the United States. Apparently this superseded any concern for the welfare of his family, none of whom presumably have ties to Romania. This effort reflects the extent that he is willing to go to avoid this Court's jurisdiction. Even if the

10

defendant's family were to travel to the United States (it is unknown when, or how realistic, this prospect is), their presence in Milwaukee no more assures his remaining in the U.S. than their presence in Turkey. If he flees, the government would not have any control over the departure of his family back to Turkey.

The final factor involves considering the nature and seriousness of the danger to the community that would be posed by the defendant's release. If the defendant were to flee back to Turkey, the very nature of his business and his willingness to support the military of a hostile nation, represents a significant risk to American service men and women serving in the Gulf Region, and by extension the security interests of American citizens here at home.

The government recognizes that pretrial release is often the norm, but this is not a *normal* case. Courts are not required to go to extraordinary lengths to construct or fashion conditions that would erect a virtual fence around a defendant. *United States v. Tortora*, 922 F,2d 880, 887 (1st Cir. 1990) ("[t]he Bail Reform Act…does not require release of a dangerous defendant if the only combination of conditions that would reasonably assure societal safety consist of heroic measures beyond those which can fairly be said to have been within Congress's contemplation."); *see also United States v. Michelson*, 607 F.Supp. 697 (E.D.N.Y. 1985) (denying a motion for release on bond in espionage case because, *inter alia*, "there was no extradition treaty between the United States and" the relevant countries to which the defendant allegedly had ties).

The defendant cites in support of his position *United States v. Hutchins*, 2017 WL 5135671 (E.D.Wis. 2017). The circumstances here are vastly different than those in *Hutchins*. First, the defendant in that case, a British national charged with computer fraud, was *already*

11

*residing* and *employed* in the U.S. prior to his arrest at an *established residence* in Los Angeles. Id., at *1. Secondly, the motion before the court was for a *modification* of existing bond conditions, with the government already having "conceded…that pretrial detention is not necessary," and having decided not to lodge any appeal to the court's initial order setting bond conditions. Id., at *3. Further, the motion to modify the bond conditions was supported by the court's Pretrial Services officers. Id., at *4. The defendant had not absconded during the time of the initial bond conditions *and* while under the less restrictive conditions – including appearing voluntarily and unaccompanied for earlier court proceedings – showing "a demonstrated track record" and a "history of compliance" with release conditions. Id., at *2. The defendant in *Hutchins* "demonstrated time and again his willingness to comply with his obligations to appear in this Court as required." Id., at *4. The *Hutchins* court noted that the government appeared to seek to raise arguments against a *modification* of the bond conditions that (i) didn't apply logically to the nature of the specific modifications but more aptly (ii) should have been raised previously in an argument for pre-trial detention. Id., at *3.

All the factors noted in *Hutchins*, which were central to the court's finding that the terms and conditions of release reasonably assured the defendants appearance, are completely inapposite to those associated with this defendant.

A brief survey of other cases in which the courts have considered the circumstances of various defendants in terms of flight risk and bond show a range of factors *not* present in this case. *See United States v. Wade*, 2007 WL 2005556, *2 (E.D. Wis. 2007) (defendant "life-long resident of Milwaukee" with ten children in Milwaukee and receives disability payments as source in income in Milwaukee); *United States v. Chevez-Rivas*, 536 F. Supp.2d 962, 969 (E.D.

12

Wis. 2008) (illegal alien defendant had "strong family and community ties," had resided with family including five young children in Milwaukee for a decade, wife is a U.S. citizen, other family members also reside in U.S.); *United States v. Hammond*, (E.D. Wis. 2002) (defendant has "strong family ties" to the area and few personal resources, and continued to reside while aware he was facing charges); *United States v. Lopez*, 827 F.Supp 1107, 1109 (D.N.J. 1993) (drug trafficking defendant with strong family and community ties and longtime resident of state); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (defendants both demonstrate "economic and social stability" in the U.S, demonstrating U.S. employment and residence for years, family and established business ties in Florida).

On the other hand, a brief example of cases in which the court denied release and ordered pretrial detention included findings more consistent with the circumstances of this defendant. In *United States v. Medina*, 775 F.2d 1398, 1400 (11th Cir. 1985), the court found that detention was warranted based on a finding of a high risk of flight where the defendant charged with possession with intent to distribute marijuana "had not demonstrated strong ties to the community" and the "totality of evidence" provided "a strong indication that [defendant] would be a risk to flee." In *United States v. Stewart*, 19 Fed. Appx. 46, 47-48 (4th Cir. 2001), the Fourth Circuit affirmed the district court's decision to reverse the magistrate judge's release order on bond for a defendant charged with a $56 million Ponzi scheme. The *Stewart* Court found that the defendant posed a substantial risk of flight based upon the totality of circumstances, including that the defendant had significant financial resources overseas, maintained "at least one offshore bank account," had demonstrated means to travel internationally using other identities and the knowledge to evade government detection, and that

13

cooperating co-defendants increased the strength of the evidence against the defendant. Based on these factors, the Fourth Circuit found that "it is not likely that any condition or combination of conditions would reasonably assure [the defendant's] appearance." Id., at 49.

Needless to say, each case and situation is unique to itself. The government offers these examples only to emphasize and suggest that for *this* defendant, all the factors point emphatically toward the defendant having a strong incentive and reason to flee with no available recourse to the government or this Court. There exists no *reasonable* condition or combination of conditions to assure that the defendant would remain in the United States without erecting a proverbial or virtual fence around his rented short-term apartment.

WHEREFORE, for the reasons and authorities cited here, the United States respectfully opposes the Defendant's Motion for Release and petitions the Court to continue the existing order of pretrial detention which was entered on December 13, 2017.

Respectfully submitted this 12th day of February 2018, in Milwaukee, Wisconsin.

        GREGORY J. HAANSTAD
        United States Attorney

By:   */s/ Paul L. Kanter*____
       PAUL L. KANTER
       Assistant U.S. Attorney
       Bar No: 1005035
       Office of the United States Attorney
       Eastern District of Wisconsin
       517 East Wisconsin Avenue, Room 530
       Milwaukee, Wisconsin 53202
       Telephone: (414) 297-4104
       Fax: (414) 297-1738
       Email: paul.kanter@usdoj.gov

       KEITH S. ALEXANDER
       Assistant U.S. Attorney
       Bar No: 1053000

Office of the United States Attorney
Eastern District of Wisconsin
517 East Wisconsin Avenue, Room 530
Milwaukee, Wisconsin 53202
Telephone: (414) 297-4530
Fax: (414) 297-1738
Email: keith.alexander@usdoj.gov

WILLIAM MACKIE
United States Department of Justice (DC)
National Security Division
600 E St NW - Ste 10810
Washington, DC 20530
202-233-2122
Fax: 202-233-2146
Email: will.mackie@usdoj.gov