UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

     Plaintiff,

  v.              Case No:  17-CR-122

RAMOR DIS TICARET, LTD.
a/k/a The Ramor Group,

     Defendant.

## **PLEA AGREEMENT**

1.  The United States of America, by its attorneys, Matthew D. Krueger, United States Attorney for the Eastern District of Wisconsin, and Paul L. Kanter and Keith S. Alexander, Assistant United States Attorneys, and William Mackie, Trial Attorney, National Security Division, U.S. Department of Justice, and the defendant, Ramor Dis Ticaret, Ltd., a/k/a The Ramor Group ("Ramor"), acting by and through its duly appointed and authorized corporate officer, and its attorney, Nejla K. Lane, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following Plea Agreement:

### **CHARGES**

2.  Ramor has been charged in a thirteen-count Indictment, which alleges  violations of Title 18, United States Code, Sections 2, 371, and 554(a), and Title 50, United States Code, Section 1705(a).

3.  Ramor has been informed and understands the charges against the corporation contained in the Indictment.  Further, Ramor fully understands the nature and elements of

the crimes with which the corporation has been charged and the terms and conditions of the Plea Agreement.

4. Ramor voluntarily agrees to plead guilty to Count One of the Indictment as fully set forth in Attachment A.

5. Ramor acknowledges and agrees that the corporation is, in fact, guilty of the offense described in Attachment A. Ramor acknowledges and understands that if this case were to proceed to trial, the government would be able to prove the facts set forth in Attachment B beyond a reasonable doubt. Ramor admits that these facts are true and correct and establish the guilt of the corporation beyond a reasonable doubt. The information contained in Attachment B is being provided for the purpose of setting forth a factual basis for the plea of guilty and does not represent a full recitation of Ramor's participation or role in this offense.

## PENALTIES

6. Ramor acknowledges and agrees that the offense of conspiracy charged in Count One carries the following: (1) a maximum punishment pursuant to 18 U.S.C. § 3571 of a fine of $500,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant corporation resulting from the offense; and (2) a mandatory special assessment of $400.

## DISMISSAL OF REMAINING COUNTS

7. The government agrees to move to dismiss the remaining counts of the Indictment as to Ramor at the time of sentencing.

## ELEMENTS OF THE OFFENSE

8. The parties understand and agree that in order to sustain the charge of conspiracy as set forth in Count One, the government must prove each of the following propositions beyond a reasonable doubt:

2

<u>First,</u> that the conspiracy as charged existed;

<u>Second,</u> that the defendant corporation knowingly became a member of the conspiracy with an intent to advance the conspiracy; and

<u>Third,</u> that one of the conspirators committed an act in furtherance of the conspiracy in an effort to advance the goals of the conspiracy.

## SENTENCING PROVISIONS

9. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant corporation.

10. Ramor acknowledges and agrees that the corporation's attorney has discussed the potentially applicable sentencing guidelines provisions with the authorized corporate officer to the satisfaction of the corporate officer.

11. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant corporation's criminal history. The parties further acknowledge and understand that, at the time Ramor enters a guilty plea, the parties may not have full and complete information regarding Ramor's criminal history. The parties acknowledge, understand, and agree that Ramor may not move to withdraw the guilty plea solely as a result of the court's determination of Ramor's criminal history.

## SENTENCING GUIDELINES CALCULATIONS

12. Ramor acknowledges and understands that the Sentencing Guidelines recommendations contained in this Plea Agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if Ramor provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this Plea Agreement.

3

13.     The parties agree that a conviction to Count One, charging a conspiracy to unlawfully export, is covered by U.S.S.G. § 2M5.1, Evasion of Export Controls, that this Guideline provision is not listed under U.S.S.G. § 8C2.1, which governs criminal fines for organizations. Therefore, the parties agree that Ramor's sentence is not governed by the Fine Guidelines (§§ 8C2.2 – 8C2.9) of the Sentencing Guidelines. Instead, pursuant to U.S.S.G. § 8C2.10, the sentence is determined by applying 18 U.S.C. §§ 3553 and 3572.

## RELEVANT CONDUCT

14.     The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the Court may consider relevant conduct in calculating the Sentencing Guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant corporation is pleading guilty.

## SENTENCING RECOMMENDATIONS

15.     Both parties reserve the right to provide the Court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

16.     Both parties reserve the right to make any recommendation regarding any and all factors pertinent to the determination of the Sentencing Guideline range and the fine to be imposed; and any other matters not specifically addressed by this Plea Agreement.

17.     The government agrees to make no recommendation regarding the ultimate sentence to be imposed; however, the government remains free to take a position with respect to any fact or factor pertinent to the sentencing decision consistent with this agreement and to advise the court that the government's failure to make a sentencing recommendation should not be construed as a recommendation for leniency or severity.

4

## COURT'S DETERMINATIONS AT SENTENCING

18.     The parties acknowledge, understand, and agree that neither the Court nor the United States Probation Office is a party to or bound by this Pleas Agreement. The United States Probation Office will make its own recommendations to the Court. The Court will make its own determinations regarding any and all issues relating to the imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in Paragraph 6. The parties further understand that the Court will be guided by the Sentencing Guidelines but will not be bound by the Sentencing Guidelines and may impose a reasonable sentence pursuant to a determined by applying 18 U.S.C. §§ 3553 and 3572.

19.     The parties acknowledge, understand, and agree that Ramor may not move to withdraw the guilty plea solely as a result of the sentence imposed by the Court.

## FINANCIAL MATTERS

20.     Ramor acknowledges and understands that any and all financial obligations imposed by the Court are due and payable in full upon entry of the judgment of conviction. Ramor further understands that any payment schedule imposed by the Court shall be the minimum the defendant corporation is expected to pay and that the government's collection of any and all court imposed financial obligations is not limited to the payment schedule. Ramor agrees not to request any delay or stay in payment of any all financial obligations.

21.     Ramor agrees to provide to the Financial Litigation Unit (FLU) of the United States Attorney's Office upon request of the FLU during any period of probation or supervised release imposed by the Court, a complete and sworn financial statement on a form provided by FLU and any documentation required by the form. Ramor further agrees, upon request of FLU whether made before or after sentencing, to promptly: cooperate in the identification of assets in which the

5

defendant corporation has an interest, cooperate in the liquidation of any such assets, and participate in an asset deposition.

## SPECIAL ASSESSMENT

22.     Ramor agrees to pay the special assessment in the amount of $400 prior to or at the time of sentencing.

## DEFENDANT'S WAIVER OF RIGHTS

23.     In entering this agreement, Ramor acknowledges and understands that the defendant corporation surrenders any claims the corporation may have raised in any pretrial motion as well as certain rights which include the following:

a.     If Ramor had persisted in a plea of not guilty to the charges against the corporation, Ramor would be entitled to a speedy and public trial by a court or jury. Ramor has a right to a jury trial. In order for a trial to be conducted by the judge sitting without a jury, Ramor, the government and the judge all must agree that the trial be conducted by the judge without a jury.

b.     If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. Ramor and the corporation's attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The Court would instruct the jury that the defendant corporation is to be presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

c.     If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of Ramor's guilt beyond a reasonable doubt.

d.     At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against Ramor. Ramor would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn Ramor could, but is not obligated to, present witnesses and other evidence on his own behalf. Ramor would be entitled to compulsory process to call witnesses.

6

24.     Ramor acknowledges and understands that by pleading guilty the corporation is waiving all the rights set forth above. Ramor further acknowledges the fact that the defendant corporation's attorney has explained these rights to the duly authorized corporate officer and the consequences of the waiver of these rights. Ramor further acknowledges that as a part of the guilty plea hearing, the Court may question the defendant corporation's duly authorized officer under oath, on the record, and in the presence of counsel about the offense to which the defendant corporation intends to plead guilty. Ramor further understands that any false statements made on behalf of the corporation may later be used against the defendant corporation in a prosecution for perjury or false statement.

25.     Ramor knowingly and voluntarily waives all claims the defendant corporation may have based upon the statute of limitations, the Speedy Trial Act, venue and the speedy trial provisions of the Sixth Amendment. Ramor agrees that any delay between the filing of this Plea Agreement and the entry of Ramor's guilty plea pursuant to this Plea Agreement constitutes excludable time under the Speedy Trial Act.

## FURTHER CIVIL OR ADMINISTRATIVE ACTION

26.     Ramor acknowledges, understands, and agrees that the defendant corporation's duly authorized officer has discussed with Ramor's attorney and understands that nothing contained in this Plea Agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against the defendant corporation.

## GENERAL MATTERS

27.     The parties acknowledge, understand, and agree that this Plea Agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

7

28.     The parties acknowledge, understand, and agree that this Plea Agreement will be filed and become part of the public record in this case. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant corporation's conviction.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

29.     Ramor acknowledges and understands if the defendant corporation violates any term of this Plea Agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this Plea Agreement shall become null and void at the discretion of the government. Ramor further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this Plea Agreement is revoked or if Ramor's conviction ultimately is overturned, then the government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this Plea Agreement. Ramor hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against Ramor as a result of any breach of this Plea Agreement. Ramor understands, however, that the government may elect to proceed with the guilty plea and sentencing.

8

## VOLUNTARINESS OF DEFENDANT CORPORATION'S PLEA

Ramor acknowledges, understands, and agrees that the defendant corporation will plead guilty freely and voluntarily because the corporation is in fact guilty. Ramor further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this Plea Agreement, to induce Ramor to plead guilty.

Date: 3/1/19

RESIT TAVAN
Authorized Officer of Ramor Dis Ticaret, Ltd.


I am the defendant corporation Ramor's attorney. I carefully have reviewed every part of this Plea Agreement with the defendant corporation's duly authorized officer. To my knowledge, my client's decision to enter into this Plea Agreement is an informed and voluntary one.

Date: 8/1/19

Nejla K. Lane, Esq.
Attorney for Defendant Ramor Dis Ticaret, Ltd.


For the United States of America:

Date: 3/7/19

for MATTHEW D. KRUEGER
United States Attorney

Date: 3/7/19

PAUL L. KANTER
KEITH S. ALEXANDER
Assistant United States Attorneys

9

**ATTACHMENT A**

Relevant Individuals and Entities

At all times relevant to this Indictment:

1.     RAMOR DIS TICARET, LTD., a/k/a The Ramor Group ("RAMOR"), was registered as a corporation in Turkey with an office located in Istanbul.  RAMOR's business included procuring commercial marine equipment, goods, and materials from the United States for shipment to customers in Iran.   One of RAMOR's customers was Qeshm Madkandalou Shipbuilding Cooperative of Iran.

2.     RESIT TAVAN ("TAVAN") was a citizen of Turkey residing in Istanbul. TAVAN was the sole owner and President of RAMOR.

3.     FULYA KALAFATOGLU OGUZTURK ("OGUZTURK") was a citizen of Turkey residing in Istanbul.   OGUZTURK was employed by RAMOR as a Deputy Manager.

4.     Qeshm Madkandalou Shipbuilding Cooperative of Iran ("Madkandalou") was an Iranian entity affiliated with the Government of the Islamic Republic of Iran.   Madkandalou was located on Qeshm Island, Iran.

5.     Rohollah Vosoughi ("Vosoughi") was an Iranian citizen who resided at times in both Iran and Turkey.    Vosoughi worked for both Madkandalou and RAMOR, serving at times as a commercial manager for Madkandalou.

6.     Reza Almasi ("Almasi") was an Iranian citizen residing in Tehran and employed at Madkandalou as a production manager, naval architect, and shipbuilder.   Almasi was involved, among other things, in the development and building of Iranian naval vessels, including a prototype 16-meter missile attack vessel known as the RMS-16.

7.     Company A, located in the State and Eastern District of Wisconsin, was a commercial

outboard engine manufacturer that produced high-powered marine engines for both domestic and foreign customers.

8. Company B, located in the State and Eastern District of Wisconsin, was a commercial manufacturer that produced, among other products, marine generators used to power the electronic components of marine vessels.

9. Company C, located in the State and Eastern District of Wisconsin, was a commercial manufacturer that produced, among other marine products, propulsion systems.

<u>The Iran Trade Embargo and the Iranian Transactions Regulations</u>

10. The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1702(a)(1), gave the President of the United States broad authority to regulate exports and other international transactions in times of national emergency. IEEPA controls were triggered by an executive order declaring a national emergency based on an "unusual and extraordinary threat, which had its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." Executive orders issued pursuant to IEEPA could impose broad trade restrictions against a particular country that were more comprehensive than standard export controls. An embargo barred United States persons from engaging in a broad range of transactions involving an offending foreign government or its nationals, unless specific United States government authorization was obtained in advance.

11. Pursuant to IEEPA authority, on March 15, 1995, the President issued Executive Order 12957, which declared a national emergency with respect to Iran and the government of Iran. The executive order was issued based on presidential findings that the policies and actions of the government of Iran constituted a threat to the national security of the United States due to

2

Iran's support of international terrorism and its attempts to acquire weapons of mass destruction.

12. Pursuant to IEEPA authority, on May 6, 1995, the President issued Executive Order 12959, which declared a trade embargo against Iran, prohibiting (with limited exceptions not applicable here) the export from the United States to Iran of any goods, technology, or services. On August 17, 1997, the President reiterated and renewed the embargo by issuing Executive Order 13059. The most recent continuation of this declaration of national emergency and embargo was issued on January 13, 2017. The embargo has remained in effect during all times relevant to this Indictment.

13. The United States Department of Treasury, Office of Foreign Assets Control ("OFAC") issued regulations implementing the executive order and trade embargo (the "Iranian Transactions Regulations" or "ITR"). In October 2012, the Department of Treasury reissued and renamed the ITR as the Iranian Transactions and Sanctions Regulations ("ITSR"). The substantive provisions of the ITR were not changed by this action and remained in effect. Without a license issued by OFAC, these regulations prohibited both (i) the export of goods or services from the United States to Iran and (ii) the reexportation of U.S. origin goods and services from a third country, directly or indirectly, to Iran.

14. The Executive Orders and the ITR or ITSR were in effect at all times relevant to this Indictment.

15. At no time relevant to this Indictment did RAMOR, TAVAN, and OGUZTURK, or any other entity controlled by RAMOR, TAVAN, and OGUZTURK, obtain a license from OFAC authorizing any of them to export any goods from the United States to Iran.

3

## Reports to the United States Government and the Automated Export System

16.    Under United States law and regulation, exporters, shippers, and freight forwarders were required to file certain forms and declarations concerning exports of goods and technology from the United States. Typically, those filings were completed through the submission of Electronic Export Information ("EEI") via the Automated Export System ("AES"). The U.S. Department of Homeland Security ("DHS"), Bureau of Customs and Border Protection, administered the AES. The EEI and accompanying materials were official documents submitted to the DHS in connection with export shipments from the United States.

17.    An essential and material part of the EEI was information concerning the ultimate consignee and the country of ultimate destination for the export. The identity of the ultimate consignee determined whether the goods (a) could be exported without any specific authorization from the United States government; (b) could be exported with the specific authorization and validated license from OFAC; or (c) could not be exported from the United States.

18.    The EEI was equivalent to a sworn statement to the United States government that the transaction occurred as described. The EEI was used by the United States Bureau of Census to collect trade statistics and by the Department of Commerce, Bureau of Industry and Security ("BIS"), for export control purposes.

## COUNT 1

### THE GRAND JURY FURTHER CHARGES THAT:

19.    Beginning in or around March 2013, the exact date being unknown to the Grand Jury, and continuing through in or about July 2015, in the State and Eastern District of Wisconsin and elsewhere,

4

**RAMOR DIS TICARET, LTD.,**
**a/k/a The Ramor Group,**
**RESIT TAVAN, and**
**FULYA KALAFATOGLU OGUZTURK,**

knowingly and intentionally combined, conspired, confederated, and agreed with each other and with others known and unknown to the Grand Jury,

(a) to defraud the United States by impairing, impeding, and obstructing the lawful governmental functions of the United States Department of Treasury, that is, the enforcement of laws and regulations prohibiting the export of goods from the United States to Iran without a license; and

(b) to commit an offense against the United States, to wit: smuggling, by knowingly and fraudulently exporting and sending, and attempting to export and send, from the United States to Iran, articles and objects contrary to IEEPA, Title 50, United States Code, Section 1705, and the ITSR, Title 31, Code of Federal Regulations 560.203-205, in violation of Title 18, United States Code, Section 554(a);

## MANNER AND MEANS OF THE CONSPIRACY

20.    The conspirators would and did use the following manner and means, among others, to accomplish the objects of the conspiracy:

a.    TAVAN, OGUZTURK, and RAMOR, directly and indirectly ordered, negotiated, and procured equipment, goods, and technologies from United States companies for the end use of one or more persons and entities associated with, or part of, the Iranian military.

b.    TAVAN, OGUZTURK, and RAMOR, directly and indirectly purchased equipment, goods, and technologies from the United States as directed by persons and entities located in Iran, including Almasi and Madkandalou, knowing that such equipment, goods, and

5

technologies would be exported and reexported through Turkey to Iran.

        c.     TAVAN, OGUZTURK, and RAMOR, together with other unindicted coconspirators, exported and reexported, and caused the export and reexport, of U.S. origin goods, technology, and services to Iran for the use of persons and entities associated with or part of the Iranian military and, in order to do so, evaded and otherwise failed to obtain the required export licenses from the United States government.

## ACTS IN FURTHERANCE

21.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the conspirators committed or caused to be committed one or more of the following acts in the State and Eastern District of Wisconsin and elsewhere.

### The Exportation of Two Model 557 Engines from Company A

22.     In April and May, 2013, TAVAN communicated by email with Vosoughi concerning the acquisition of U.S. origin Model 557 high-powered outboard engines manufactured by Company A (the "557 Engines") in the Eastern District of Wisconsin. On May 8, 2013, TAVAN sent a pro forma invoice to Vosoughi and OGUZTURK regarding the purchase of two 557 Engines.

23.     On May 15, 2013, Vosoughi sent by email to Almasi and other persons at Madkandalou a copy of a pro forma invoice regarding the purchase of the 557 Engines showing a total purchase price of $204,604.

24.     On May 21, 2013, TAVAN, on behalf of RAMOR, signed a purchase agreement for the 557 Engines with a U.S. commercial brokerage business acting as an agent for RAMOR in dealing with Company A. TAVAN represented that the 557 Engines would only be used in

6

Turkey and that, pursuant to U.S. law, RAMOR would not transfer the 557 Engines to any "sanctioned nation."

25.     On July 1, 2013, TAVAN signed a BIS Form 711, "Statement by Ultimate Consignee and Purchaser," which identified RAMOR, Istanbul, Turkey, as the ultimate consignee, and certified that the 557 Engines would be used in Turkey and would not be reexported.

26.     On September 13, 2013, Vosoughi sent by email to Almasi and others at Madkandalou, two documents, a packing list and an invoice, both bearing RAMOR letterhead and addressed to "Qeshm Madkandalou Shipbuilding Cooperative Co., Shibderaz Village - Kandalou Region - Qeshm Island - Iran."   Item 5 on both documents references a set of two outboard motors, and item 5 on the packing list identifies two 557 horsepower outboard engines manufactured by Company A.

27.     On December 29, 2013, Almasi emailed Vosoughi and TAVAN concerning the return of the 557 Engines from Iran to Turkey.

28.     On January 27, 2014, Vosoughi emailed TAVAN and OGUZTURK an invoice on Madkandalou letterhead for return shipment of the 557 Engines from Qeshm Island, Iran, to RAMOR in Istanbul, Turkey.

29.     During June 2014, RAMOR transmitted a total of $190,000 from Turkey to Company A's broker in the United States.

**The Exportation of a Marine Generator from Company B**

30.     On December 1, 2013, acting on behalf of RAMOR, TAVAN signed a contract with Madkandalou by which RAMOR agreed to act as a general contractor for Madkandalou on a project to design and build a "High Speed Composite Boat," known as the RMS-16, for delivery

7

and use in Iran. RAMOR agreed to procure necessary component parts required to construct the RMS-16, including procuring one of three types of marine power generators, one of which was manufactured in the U.S. by Company B in the Eastern District of Wisconsin.

31.    On July 14, 2014, Almasi sent an email to Vosoughi and a naval architect directing that the RMS-16 be designed and constructed to allow clearance for a "Nasr type" missile. In response, on July 14, 2014, the naval architect sent an email to Almasi, Vosoughi, and TAVAN confirming that the RMS-16 design provided sufficient clearance for the missile system. Attached to the email is a digital drawing of the RMS-16 showing integrated covert missile launching tubes.

32.    On December 30, 2014, Almasi sent Vosoughi an email that included as an attachment a pro forma invoice to RAMOR from a Turkish distributor of Company B. The pro forma invoice, in the amount of $13,250, was for a "17.5EFOZD" marine diesel generator manufactured by Company B. The invoice included a handwritten notation of "RMS-16."

33.    On January 5, 2015, and June 30, 2015, RAMOR paid $6,628 and $6,622, respectively, to Company B's Turkish distributor. Appearing on a document related to the June 2015 payment are handwritten notations reading "RMS-16," "generator," and the name of Company B's Turkish distributor.

34.    On June 1, 2015, via money wire transfer, the Turkish distributor paid $9,686.40 to Company B for the marine generator.

35.    On July 6, 2015, Vosoughi emailed Almasi a packing list and invoice on RAMOR letterhead, dated July 3, 2015, and addressed to Madkandalou which included a line item referring to Company B's 17.5 Marine Generator; Qty: 1; Origin: USA.

8

## The Exportation of Marine Surface Drives from Company C

36.     Pursuant to the RMS-16 contract, RAMOR sought to purchase marine power propulsion equipment, known as Arneson ASD-14 Surface Drives, from Company C for delivery to Madkandalou for use on the RMS-16.   On January 30, 2015, a Turkish distributor for Company C provided a preliminary price quotation to RAMOR for two Arneson ASD-14 Surface Drives, manufactured by Company C in the Eastern District of Wisconsin.   Vosoughi emailed the quotation to Almasi on February 10, 2015.

37.     On February 2, 2015, a Turkish distributor for Company C provided a pro forma invoice to RAMOR for two Arneson ASD-14 Surface Drives, manufactured by Company C. Vosoughi emailed the pro forma invoice to Almasi on February 20, 2015, stating a total cost of $157,000.

38.     In June 2015, RAMOR paid $142,000 to Company C's Turkish distributor for the purchase and export of two Arneson ASD-14 Surface Drives.

39.     On July 6, 2015, Vosoughi emailed Almasi a packing list and invoice on RAMOR letterhead, dated July 3, 2015, and addressed to Madkandalou which included a line item referring to Company C's Arneson Propulsion System; Qty: 2; Origin: USA.

40.     On July 27, 2015, the Turkish distributor paid approximately $113,000 to Company C via money wire transfer for the Arneson ASD-14 Surface Drives.

9

## ATTACHMENT B

## STATEMENT OF FACTS

The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove the facts set forth below beyond a reasonable doubt. The defendant admits that these facts are true and correct and establish his guilty beyond a reasonable doubt. This information is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

The International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1702(a)(1), gave the President of the United States broad authority to regulate exports and other international transactions in times of national emergency. IEEPA controls were triggered by an executive order declaring a national emergency based on an "unusual and extraordinary threat, which had its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States." Executive orders issued pursuant to IEEPA could impose broad trade restrictions against a particular country that were more comprehensive than standard export controls. An embargo barred United States persons from engaging in a broad range of transactions involving an offending foreign government or its nationals, unless specific United States government authorization was obtained in advance.

Pursuant to IEEPA authority, on March 15, 1995, the President issued Executive Order 12957, which declared a national emergency with respect to Iran and the government of Iran. The executive order was issued based on presidential findings that the policies and actions of the government of Iran constituted a threat to the national security of the United States due to Iran's support of international terrorism and its attempts to acquire weapons of mass destruction.

Pursuant to IEEPA authority, on May 6, 1995, the President issued Executive Order 12959, which declared a trade embargo against Iran, prohibiting (with limited exceptions not applicable here) the export from the United States to Iran of any goods, technology, or services. On August 17, 1997, the President reiterated and renewed the embargo by issuing Executive Order 13059. The most recent continuation of this declaration of national emergency and embargo was issued on January 13, 2017. The embargo has remained in effect during all times relevant to this Indictment.

The United States Department of Treasury, Office of Foreign Assets Control ("OFAC") issued regulations implementing the executive order and trade embargo (the "Iranian Transactions Regulations" or "ITR"). In October 2012, the Department of Treasury reissued and renamed the ITR as the Iranian Transactions and Sanctions Regulations ("ITSR"). The substantive provisions of the ITR were not changed by this action and remained in effect. Without a license issued by OFAC, these regulations prohibited both (i) the export of goods or services from the United States to Iran and (ii) the reexportation of U.S. origin goods and services from a third country, directly or indirectly, to Iran.

The Executive Orders and the ITR or ITSR were in effect at all times relevant to this Indictment. At no time relevant to this Indictment did RAMOR, TAVAN, and OGUZTURK, or any other entity controlled by RAMOR, TAVAN, and OGUZTURK, obtain a license from OFAC authorizing any of them to export any goods from the United States to Iran.

From 2012 onward, the Resit Tavan, a citizen of Turkey residing in Istanbul, was the sole owner and president of the Istanbul based Turkish corporation Ramor Dis Ticaret, Ltd., also known as the Ramor Group ("Ramor"). Fulya Kalafatoglu Oguzturk ("Oguzturk"), a Turkish

2

citizen, was an employee of Ramor and served as the Acting Deputy Manager of Ramor. Ramor operated as a commercial supply business, including procuring marine equipment, goods, and materials from the United States for delivery and shipment to Iran. A primary customer of Ramor was the Qeshm Madkandalou Shipbuilding Cooperative ("Madkandalou"), a commercial business located in Qeshm Island, Iran. An important portion of Madkandalou's business involved marine engineering and boat construction for Iranian military or naval forces. Rohollah Vosoughi, an Iranian citizen, was a commercial manager at Madkandalou. Vosoughi worked with Tavan on site at Ramor from 2013 through 2015. Vosoughi's duties while working at Ramor was to manage and supervise Ramor's business with Madkandalou in cooperation with Tavan. Reza Almasi, an Iranian citizen, was employed at Madkandalou in Iran as a production manager, architect, and shipbuilder. Almasi's work during this time included developing a proto-type 16 meter missile attack boat known as the RMS-16.

From early 2013 through 2015, Tavan, operating through Ramor and in association and in cooperation with Oguzturk and Vosoughi, directly and indirectly negotiated, ordered, procured and caused the illegal export of marine related goods and technologies from the United States to Madkandalou in Iran for use by the Iranian military, using Turkey as an intermediary transshipment point. Tavan (i) received orders for certain U.S. origin marine materials from persons and entities located in Iran, including Almasi and Madkandalou, (ii) took actions to cause the procurement of these U.S. origin materials; (iii) caused the export of these U.S. origin materials from the U.S. to Turkey based upon the false representation that the true end user was Ramor; and (iv) caused the illegal re-export of these materials to Iran. Tavan had knowledge of U.S. sanctions and the embargo with regard to Iran, and he knew that U.S. goods and materials

3

could not be exported from the U.S. to Iran.

In early 2013, Tavan communicated with both Vosoughi and Almasi about procuring U.S. origin Model 557 high-powered outboard engines manufactured by a U.S. company in the Eastern District of Wisconsin (the "557 Engines") for export and delivery to Madkandalou. In May 2013, Tavan, on behalf of Ramor, executed a purchase agreement for the purchase of the 557 Engines with the manufacturer's brokerage company. In 2013, Tavan signed a U.S. Department of Commerce form (the "BIS Form 711") falsely stating that the 557 Engines would be only used in Turkey, when Tavan knew that the 557 Engines were to be delivered and used in Iran by Madkandalou. In September 2013 the 557 Engines were delivered to Madkandalou in Iran, following payments of USD $190,000 by Ramor to the U.S. based brokerage company acting on behalf of the U.S. based manufacturer.

In December 2013, Tavan, acting as an officer of Ramor, entered into a contract with Madkandalou whereby Ramor agreed to serve as a general contractor for Madkandalou on a project to design and build a "High Speed Composite Boat," known as the RMS-16, for delivery and use in Iran (the "RMS-16 Contract"). Tavan, through Ramor, agreed to procure various equipment and parts required to construct the RMS-16, including one of three types of marine power generators, one of which was manufactured in the U.S. in the Eastern District of Wisconsin (the "Marine Power Generator"). In late 2014, Ramor received a pro forma invoice for $13,250 for the Marine Power Generator from a Turkish distributor of the U.S. based manufacturer. Included on this invoice was a handwritten notation of "RMS-16." In January and June 2015, RAMOR paid $6,628 and $6,622, respectively, for the purchase of the Marine Power Generator to the Turkish distributor of the U.S. manufacturer. The U.S. manufacturer

4

supplied the Marine Power Generator and exported it from the United States to the Turkish Distributor, and in July 2015 the Marine Power Generator was shipped to Madkandalou.

Also in early 2015, pursuant to the RMS-16 contract, Tavan, acting through RAMOR, took actions to purchase a specialized marine power propulsion equipment known as Arneson ASD-14 Surface Drives from a U.S. based manufacturer located in the Eastern District of Wisconsin for delivery to Madkandalou for use on the RMS-16. In February 2015, Ramor received a pro forma invoice for $157,000 from a Turkish distributor for the U.S. manufacturer for two U.S. origin Arneson ASD-14 Surface Drives. In June 2015, RAMOR paid $142,000 to the Turkish distributor for the U.S. manufacturer towards the purchase and export of these Arneson ASD-14 Surface Drives. The U.S. manufacturer supplied the Arneson ASD-14 Surface Drives and exported these items from the United States to the Turkish Distributor. In July 2015, these Arneson ASD-14 Surface Drives were shipped to Madkandalou.

From at least July 2014 onward, Tavan and Ramor were aware and knew of the general outlines and nature of the U.S. laws that imposed trade sanctions on Iran and that it was illegal to export U.S. goods to Iran. Tavan and Ramor caused the export of the marine equipment and materials noted above based upon the false representation that the true end user was Ramor in Turkey. At no time did Tavan, Ramor or any officers or employees thereof, or anyone else cause the U.S. manufacturers to apply for, or receive, any export license or export authorization from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") for the export of the specific equipment and parts described herein.

5